FILED
2025 May-28  PM 04:14
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ALABAMA

FILED

2025 MAY 28  P 3:01

U.S. DISTRICT COURT
N.D. OF ALABAMA

MELVIN RAY,

    PLAINTIFF,

                        JURY TRIAL DEMANDED

V.

JOHN HAMM, COMMISSIONER,

WILLIAM STREETER, WARDEN II

DENICE MCKENZIE, WARDEN I,

SHANNON CALDWELL, CAPTAIN,

RYAN WALLIS, CAPTAIN,

JEREMY PELZER, CAPTAIN,

A.J. JOHNSON, LIEUTENANT,

SEIGFRIED BILL, ASST. CHAPLAIN,

JAMES WILLIAMS, CHAPLAIN,

CHADWICK CRABTREE, WARDEN III,

JAMES AND SOPHIA CHAMBERS, CORRECTIONAL OFFICER/STAFF

BECCA MARSH, CORRECTIONAL OFFICER,

TIA M. SCOTT, CORRECTIONAL OFFICER,

MONIKA BLAKENEY, CORRECTIONAL OFFICER,

UNIVERSAL PROTECTION SERVICE, /dba/ ALLIED UNIVERSAL

SECURITY SERVICES, LP.,

    DEFENDANTS

CIVIL RIGHTS COMPLAINT FOR VIOLATIONS OF THE
PLAINTIFF'S FIRST, EIGHTH, AND FOURTEENTH
AMENDMENT RIGHTS TO THE US CONSTITUTION AND
THE RELIGIOUS LAND USE OF INSTITUTIONALIZED PERSONS ACT

-1-

SECTION I.
CAUSE OF ACTION

   The defendants are operating Limestone Correctional Center pursuant
to customs, policies and practices that promote intentional and purposeful
racial and religious discrimination and segregation, and these policies,
customs and practices have resulted in arbitray and unequeal access to
educational, rehabilitational, vocational, and religious access, resources
and services, and denies a safe and secure living environment while maintained
under conditions that violate the Plaintiff's First, Eight and Fourteenth
amendment Rights to the U. S. Constitution and the Religious Land Use of
Institutionalized Persons Act.


SECTION II.
PARTIES

1.  The Plaintiff Melvin Ray, also  known as Bennu Hannibal Ra-Sun, is
an Alabama and United States citizen who is currently incarcerated in the
State of Alabama Department of Corrections at Limestone Correctional Center.


2.  Defendant John Hamm is the Commissioner for the Alabama Department
of Corrections. In his capacity he is responsible for all day-to-day operations,
procedures, training, supervision, leadership, discipline and maintenance
of the ADOC. He is further  responsible for ensuring a safe, secure and
rehabilitative environment at all Alabama prisons and is bound by his Oath
of Office and statutory duties to uphold the law and respect the Constitutional
rights of all individuals in state custody. He is being sued in his personal
capacity for damages, and in his professional capacity for declaratory and
injunctive relief.


3.  Defendants William streeter, Warden II, and Denise McKenzie, Warden
3, are the wardens at Limestone CC. They are responsible for all day-to-
day operations at Limestone, including overweeing job and bed assignments,

reviewing incident reports, approving/disapproving disciplinary reports, overseeing contraband searches and LESD referrals, and otherwise ensuring a safe, secure, and rehabilitative environment for all persons under their supervision. These defendants are further responsible for training, staffing, supervisonn of subordinants, discipline of staff, and protection and respect for the Constitutional Rights of the individuals in their custody at Limestone. They are being sued in their personal capacity for damages, and in their official capacity for declaratoy and injunctive relief.

5. Defendants Shannon Caldwell, Ryan Wallis, and Jeremy Pelzer, are correction-al Captains and supervisors at Limestone CC. They are responsible for exercising supervisory authority throughout the prison, whi.ch includes overseeing job and bed assignments, incident reports, the writing of disciplinaries, and ensuring that each individual is provided a safe, secure and rehabilitative environment. These supervisors/defendants are also responsible for supervision of subordinants, duty logs and issuing post assignments, training, discipline of staff and administrative rules violators, and respecting and protecting the Constitutional Rights of individuals inaarcerated at Limestone. They are being sued in the personal capacity for damages, and in their professional capacity for declaratory and injunctive relief.

6. Defendant A.J. Johnson is a corrections lieutenant and supervisor at Limestone CC. She is responsible for exercising supervisory authority throughout the prison, including overseeing job and bed assignments, reviewing incident reports, authorizing disciplinary infractions, and overall ensuring that each individual in custody is provided a safe, secure and rehabilitative living environment. She is also responsible for training, staffing posts and job assignments, and discipline of staff and individuals under her charge.

-3-

she is being sued in her personal capacity for damages, and in her professional capacity for declaratory and injunctive relief.

5.  Defendants James Williams, Chaplain, and Seigfried Bill, Asst. Chaplain, are the religious authority at Limestone CC, and are responsible for exercising direction and leadership over religious (and some security) matters, including ensuring that the religious rights of all individuals at Limestone are resprecte Their duties include ensuring compliance with all ADOC regulations and Religious activities Review Committee directives concerning religious rights, and overseeing religious programming and support services, managing the Faith ased Honor Dorm, and distribution of resources for religious exercise. They are being sued in their individual capacities for damages, and in their professional capacity for declaratory and injunctive relief.

6.  Defendants Chadwick Crabtree, Warden III, Corrections Supervisor Sgt. James Chambers and his wife, Sophia, Classification/Stfff, and Correctional Officers Becca Marsh, Tia M. Scott, and Monika Blakeney, are all former employees at Limestone CC who have been arrested and or forced into resignation for abuses of state authority, including by promoting prison contraband, using their official position for personal gain, manufacturing and or distri-buting drugs, and otherwise conspiring to create inhumane, dangerous and unconstitutional conditions of confinement at Limestone CC. These Defendants have caused deaths by violence, including murder, suicide and drug overdoe, sexual assaults, kidnappings, extortion of family members and other constitutio-nal rights of individuals under their supervision and authority. These Defendants are all being sued in their personal capacities for damages.

7.  Defendant Universal Protection Services, LP., is a private security contractor corporations doing business in the State of Alabama. Defendant

UPS is contracted with the state of Alabama through the Alabama Department of Corrections and Defendant Hamm to provide safety, security and custodial and transportation services. Defendant UPS is responsible for ensuring a safe, secure and rehabilitative environment for individuals under their supervision, custody and control, and for providing competent, properly trained employees to discharge their duties in conformity with state and federal law. Defendant UPS is being sued in their personal capacity for damages, and fin their p ofessional capacity for declaratory and injunctive relief.

## SECTION III.

### FACTS

. As adequately stated by the plaintiff in **Williams v. Pelzer**, et. al., Case No. 5:24-cv-00707, and quoted extinsively by the Magistrate Judge in its Memorandum and Order, "the **United States Department of Justice (DOJ) has issued 'two landmark reports detailing its reasonable cause to believe that the prison conditions faced by male incarcerated people in Alabama violate the Eighth Amendment's prohibition on cruel and unusual punishment.**" The Court is requested to take judicial notice of its own record.

. Collectively, these two reports, issued in April 2019, and July 2020, detail "the contributing factors to the overall unconstitutional conditions of ADOC prisons resulting in a culture in which ADOC routinely failed to provide incarcerated people with safe living conditions or protect them from violence and abuse caused by other incarcerated people." (Id.). "The report also stated DOJ's view that ADOC officials demonstrated deliberate indifference to the substantial risk of serious harm posed to people incarcerated in ADOC Facilities resulting from these unconstitutional conditions." (Id.).

10. The 2020 DOJ report detailed "the ADOC's failure to protect incarcerated people from ADOC officers' rampant use of excessive force" and "inmate on inmate violence." The 2019 and 2020 reports further detail the conditions of confinement as inhumane, caused by overcrowding, proliferation of drugs and weapons, inadequate healthcare -- as detailed in multiple class action lawsuits, including Braggs et. al. v. Dunn, et. al., @:14-cv-00601-MHT-TFM -- murders, stabbings and beatings, extortions, suicides, drug overdoses, excessive force, corruption, sexual assaults and harassment, etc., that, in the opinion of the DOJ "cannot be [brought into constitutional compliance] by voluntary means."

11.  At the same time that the DOJ and other attorneys, non-profits and advocates etc. were exposing the conditions of the Alabama prison system, the plaintiff was also doing his part to bring  the unconstitional conditons and humanitarian crisis to public awareness. The plaintiff wrote letters and sent evidence to the DOJ, filed litigation on behalf of himself and others, took pictures of the inhumane conditions, filmed testimonials and incidents at the prisons, wrote and published articels, and  conducted interviews and seminars with public officials, radio stations and newspapers.

12. These proactive steps by the plaintiff caused him to be subjected to a years-long campaign of retaliation by the defendants and other state officials, resulting in him being severely beaten by officers, years of restrictive housing and extreme isolation, verbal, mental and emotional abuse, food poisoning by officers, and multiple "hits" being placed on his life, including by ADOC staff who often employed informants and agent provacuter that were authorized by the administration to carry out attacks in their behalf against anyone who was working to expose the inhumane conditions in the prisons.

-6-

13. Additionally, as stated by numerous other litigants in these United States Courts of Appeals for the Eleventh Circuit Court of Appeals, and attested to by this plaintiff by personal experience, the Supervisory Defendants in this action and across the state of Alabama's prisons have created "gang-controlled" dormitories that are rife with violence, drugs, and deplorable living conditions. See e.g., **Scofiled v. Butler**, 2024 US Dist. LEXIS 55300 ("He alleges Ventress is 'being ran by gangs, who beat, rape, and murder other inmates.'"); **Miller v. Butler**, 2024 U.S. Dist. LEXIS 94470 ("Wardens at Fountain had a custom or practice of allowing gangs to control dorms.").

14. As stated by the plaintiff in **Scofiled**, supra, and can be attested to by this Plaintiff, the Supervisory Defendants in this action and others across the State use gang dorms "as a threat/punishment for inmates that are not involved[.]" The plaintiff (and others) has been routinely compelled to reside in these gang dorms despite the fact that he is not a gang member, as punishment and retaliation for exercising his constitutional right to expose these conditions publicly.

15. These gang-controlled dorms are racially segregated and estremely resource deprived areas that are controlled by corrupt officers, drugs, gangs, violence, and deprivation. These areas lack access to educational, recreactional and rehabilitative resources, and they are asually the most deadly and violent areas of a prison.

16. The Plaintiff is currently assigned to one such dorm at Limestone CF, where Defendant Caldwell has admitted that the plaintiff was intentionally placed pursuant to the custom and practice of the Supervisory Defendants, including Defendants Hamm, Streeter, McKenzie, Caldwell, Wallis, Pelzer,

COUNT I.

### DEFENDANT JOHN HAMM, COMMISSIONER -VIOLATION
### OF THE PLAINTIFF'S FIRST, EIGHTH AND FOURTEENTH
### AMENDMENT RIGHTS, AND THE RLUIPAO

17.   Defendant John Hamm is the Commissioner for the Alabama Department of Corrections. In this capacity, he is responsible for the overall direction, leadership, supervision and control of all ADOC operations, employees and prisons, as well as for ensuring that all individuals under his supervision and custody receive a safe, secure and rehabilitative environment.

18.   Defendant Hamm, as Commissioner, has been advised of the unconstitutional conditions that exist throughout the ADOC through reports from security staff, family members, media reports from across the US, videos and posting across social media platforms, lawsuits by incarcerated individuals, deaths, the federal government, state leaders, and from his own personal testimony and statements before the State legislature, appearances in lawsuits, and public statements he has made to the press.

19.   Just some of the information that has put Defendant Hamm on notice of the deplorable, unconstitutional and dangerous conditions at Limestone prison include the following:

>    (i)   On December 7, 2022, multiple state media outlets and the Limestone County Sheriff's Office reported on the arrest of four Limestone correctional officers as part of a years-long drug trafficking and distribution operation at Limestone, namely, former correctional officers Alex Adreas, Andre Roy, John Ketterman, and Shamarion Dozier. Despite the wide-scale scope of this operation, Defendant Hamm did not implement any changes at the prison or to the executive staff.

(ii)  On February 2, 2024, former ADOC correctional officer Ms. Tia M. Scott was arrested for using her office for personal gain, including by distributing drugs and other contraband into Limestone CC. At the time of her arrest, Officer Scott was in a romantic relationshi withLimestone supervisor Lt. Gilbert. Additionally, Officer Scott's contact information was discovered in a cellphone at another prison in Bessemer, Ala, and communications in that phone connected her activities to both prisons. Defendant Hamm did not make any changes at Limestone despite being presented with evidence of a multi-party corrutption scandal.

(iii)  On April 19, 2024, the head warden at Limesontone, Chadwick Crabtree, and his wife, were arrested in a sweeping and stunning drug manufacturing operation that was being conducted on-site at the prison, including the use of government facilities and equipment to manufacture, store, and distribute the drugs. Defendant Hamm did not remove any other executive staff member at the prison, did not take any corrective action inside the prison to stop the corruption, and did not hold any other person accountable for this operation, despite the clear circumstantial evidence that Warden Crabtree was not operating alone.

(iV) On August 2, 2024, Limestone Correctional Officer Monika Blakeney was arrested for using her office for personal gain, including by intorducing contraband into Limestone prison, which included illegal drugs.

(v) On October 2, 2024, Limestone Coprrectional Officer/Supervisor
James Chambers, and his wife, Sophia, were arrested and charged
for distribution of drugs and contraband at Limestone. at the time
of their arrests, the Chambers' were found in possession of "1.4
lbd" of meth, "1.3 lbs" of marijuana, and ten (10) drones and multiple
firearms. Defendant Hamm made no changes to Limestone executive
staff or took any other action to protect residents at the facility
from the introduction off drugs.

(vi)  The arrest of the Chambers's lead investigators to Limestone
correctional officer Becca Marsh, who was found to be in possession
of "1.2" lbs of meth. Defendant Hamm failed to make any changes
to the executive staff at Limestone of take any other action to
protect residents from dangerous drugs or violence.

(vii)  On appx. December 2024, in an alleged "drone" incident, drugs
and other contraband, including Fentanyl were found near Defendant
Streeter's residence. On the same day, drugs were discovered inside
the prison. Defendant Hamm took no corrective action or discipline
against eh executive staff at Limestone.

(viii)  On Monday or Tuesday, February 3 or 4, 2025, drugs were
allegedly found in a staff restroom at Limestone prison. Only correctional
staff has access to this location, yet Defendant Hamm took no corrective
action or make any changes to the executive staff.

(ix) kTwo additional Allied Universal Security Services employees,
under the supervison of Defendant UPS were arrested for attempting
to introduce contraband into the facility, while yet another ADOC
employee, Ms. Powell, was placed under investigation after being

found in possession of unauthorized communications with a person incarcerated at Limestone.

20. The foregoing incidents are by no means a completed list of all of the Limestone correctional officers or contract staff who have been arrested over the past 24 months. There are also several Limestone officers who have been arrested or fired for using excessive force resulting in serious injury or death. Limestone was also found to be using an illegal and inhumane "bucket detail" , and for soliciting a hit through gang members against Robert Earl Council. See Council v. Hamm, 2024 US Dist. LEXIS 139154. Defendants Streeter and Hamm have also been allegedto be in violation of individuals rights at Limestone in **Ford v. ADOC**, 2024 US Dist LEXIS 229675. Despite these lengthy and non-stop instances of credible accusations of abuse and criminal misconduct, Defendant Hamm has failed to take any corrective action, replace or fire guilty supervisors, or change any policies or customs that have lead to the unconstitutional misconduct at Limestone.

21.  additionally, despite the fact that Defendant UPS's employees continue to be arrested for drug trafficking and other misconduct allegations at Limestone and various other state prisons throughout the state, Defendant Hamm continues to engage in contract with this Defendant. Defendant UPS has demonstrated that they have employed, failed to train, and failed to take any corrective action against their employees to stop them from engaging in criminal activity at Limestone or any other prison.

IMPLEMENTING RACIAL SEGREGATION
A.  B-SIDE YARD   /   INTENTIONAL RACIAL/RELIGIOUS DISCRIMINATION

22. A randomly selected bed roster for the entire Limestone prison population revealed the following information prior to the plaintiff filing his first of  many grievences concerning the racial and religious segregation and resulting consequences of such segregation:  (See Plaintiff's Exhibit A)

   In November/December 2024, Limestone Correctional Facility was composed of the following demographics:

    (a) Total Population  2,367

    Race:  (white)  980  (41%)     (Black)  1350  (57%)    (u/other)  37  (2%)

23.  These population groups are racially segregated at Limestone CC, with the B-side yard being designated for Blacks. According to admissions made to the plaintiff by Defendant Shannanon Cladwell on april 11, 2025, B-side yard in general population is intentionally racially segregated, which is proven by the fact that B-side yard is nearly 80% Black.

24. B-side yard is the only prison yard at Limestone that does not have any programs or structured living dorms where education, rehabilitaion or recreation is permitted on a daily basis.A defining characteristic of B-side yard is the fact that all of the officers arrested for drug trafficking, nearly all use-of-force incidents, 90% of all murders, nearly all stabbings, sexual assaults, beatings, extortions, kidnappings, etc., over the past 36 month have ALL or nearly ALL taken place on B-side yard, and nearly every person murdered at Limestone in the past 25 months was Black.

25.  There are appx. 880 individuals on B-side yard, broken down into 220 beds. There are four dorms, I, J, K an L, with each dorm having a "parking lot" where

-12-

extra beds have been added into the space that, according to the blueprint and fire exit plans, is supposed to be the "day space" or area where individuals come out of their cells for recreactional/rehabilitation such as reading, writing and watch tv., etc.

26. Every dorm on B-side yard is overwhelmingly and disproportionantly Black. The demographic of each dorm is as follow:

    1. I.DORM (non-program dorm) TP 215
    R:  (w) 55    +    (b) 157    + (u) 3=215
       (25%)         (73%)     (2%)

    2. J-DORM  (non-program dorm)  TP 206
    R:  (w) 45    +    (b) 161    + (u) 0 = 206
       (27%)        (78%)    (0%)

    3. K-DORM   (NON-program dorm)  TP 206
    R:  (w) 55    +    (b) 151    + (u) 0 = 206
       (27%)        (73%)    (0%)

    4. L-DORM  (non-program dorm)  TP 203
    R:  (w) 29  +    (b) 162    + (u) 12 = 203
      (14%)        (79%)    (6%)

27.   The one hundred and eighty four white males on B-side yard represent 19% of the total white make population at Limestone. This means that 81% of all white males at Limestone reside on either A-side yard or C-side yard, which is where **all** progrmas and structured living dorms are located.

28.  The six hundred and thirty one Black males on B-side yard represent 46% of the total Black male population at Limestone. As further data will show, only 352 out of a total of 1350 Black males, or 26%, occupy a program bed at Limestone, while 669 or 70% of the total 980 white males at Limestone occupy a program bed.

**B.**
**A-SIDE YARD / GENERAL POPULATION**

29.  B-Dorm (not B-side) is one of the two primary program dorms at Limestone. B-dorm is s structured living dorm. **See Plaintiff's Exhibit____,**
**B-DORM Orientation.** according to B-dorms' SOP, this residence is available to anyone at Limestone who is willing to abide by its rules. The plaintiff was assigned to B-dorm for appx. 48 hours, before Defendant Streeter, McKenzie, wallis, Caldwell, and Pelzer had him removed without    cause. The plaintiff is one of several Black males at Limestone who are restricted from residing in any program dorm for no apparent reason other than to harass and subject to the inhumane and unconstitutional conditions of B-side yard, as retaliation for exercising his right to free speech and to petition the government for redress of grievances.

30.  B-dorm is disproportionantly white and Black males are overwhelmingly underrepresented in B-dorm:

<u>B-DORM</u> (structured living dorm)    TP  220

R:  (w) 128        (b)  84      + (u) 8  =  220

         (58%)              (38%)            (3%)

         +17%             -19%            +1%

C. C-SIDE YARD / FAITH BASED HONOR DORM

31. The other major program at Limestone is the Faith Based Honor Dorm,
which is located on C-Side Yard. according to the Administrative Regulation,
the FBHD is available to all residents at Limestone, and each applicant
must complete the application, submit to an interview and be approved
by Defendants Streeter, Chaplain Williams, Asst. Chaplain Bill, and Pelzer,
Wallis, and Caldwell. the plaintiff has attended the orientation, completed
his interviews and otherwise qualifies for admittance into the FBHD.
Nevertheless, the Supervisory Defendants listed in paragraph 31 have all
collectively conspired to deny the plaintiff access to the FBHD. The
Plaintiff is one of severl individuals knwon to be black-listed from
the FBHD, all of whom are Black males.

32.  The FBHD is overwhelmingly and disproportionantly composed of white
males, with few Blacks:

      H DORM /FAITH BASED HONOR DORM  (program dorm)   TP  397

     R:  (w)  323     +    (b)  69   +  (u)5 = 397

         (81%)            (17%)        (2%)

         (+40%)           (-40%         (=)

33. Of the two main general population program dorms, whites occupy 73%
of the total 617 beds, or 451 white males.  (323 + 128=451)

D.  PROGRAM DORMS IN RESTRICTIVE HOUSING UNIT

34.  The Defendants offer two program dorms in the restrictive housing
unit, C-dorm, A-side, and E-dorm, B-side. Allocation of these programs
beds are distributed by race as well, and mimic the assignments in general
population, i.e., white are preferred and first selected.

<u>C-DORM, A-SIDE</u> (program side of C-dorm): RHU   TP-147

C-dorm is split in half. A-side of C-dorm is a program dorm, while B-side of C-dorm is a non-program side. The demographics of the dorm are as follows:

R:  (w)  68     +   (b)  78     + (u)   1   =  147

(i) A-Side (program side)   TP   73

(w)  57        +   (b)  16  =   73

(78%)              (21%)
+37%               -36%


(ii)  B-Side  (non-program side)   TP   74

(w)  11      +    (b)  62    + (u) 1  =  74
(15%)             (83%)       (1%)
-26%              +26%


35.  The other dorm in restrictive housing that offers a program is E-Dorm. Just as with  C-dorm, however, E-dorm is also split between a program side and a non-program side. The demographic of E -dorm are as follows:

<u>E-DORM  / RESTRICTIVE HOUSING</u>   <u>TP</u>     ·132

<u>A-SIDE</u> _ (non-program side)  TP  68

(w)  18      +    (b)   49    (u)  1  =  68
  (26%)            (73%)      (1%)


<u>B-SIDE</u>   (program side)    TP  64
(w)  46      +    (b)  18     +   (u)  0  =  64
  (72%)            (28%)

36.   Thus, there are appx. 137 program beds in C-dorm and E-dorm. Blck males compose the majority of individuals in both dorms, yet white males occupy 103 of the total 137 program beds, or 75%, while the 34 Black males occupy 24% of these program beds.

37.   The statistics are even more bleak for Black males in Limestone's most restrictive housing unit, D-Dorm in restrictive housing.

   D-DORM/ CLOSED CUSTODY   (non-program dorm)

     R:  (w)  6     +      (b)   62      +   (u)  0  =  68
         (9%)              (91%)

38.   The non-program restrictive housing units at Limestone have had at least two known murderd since September 2024. Both of them were committed in majority Black housing units where knives and other weapons are allowed to roam freely. There have been at least 6 sexual assaults, and over twn stabbings in these units during this same time frame. Not a single murder, and only one serious assault has occured in the program dorms. Each of the three or four known suicides to have occured in RHU in 2024-2025 have all occurred in thenon-program dorms. Black males are exposed to more danger, more weapons, and drugs, and deprivation of resources at every area of Limestone prison compared to similarly situated white males.

E. F-DORM / SEMI-PROGRAM DORM

   The other program dorm at Limestone is F-Dorm in general population. This dorm is distinguished from B-dorm and H-dorm in that, while it is a program dorm, it still maintains some of the problematic characteristics

of B-side yard, in that it still has pockets of violence, drug use and dealing, and a lack of constitutional living conditions. However, F-dorm does have a racial composition that reflects the composition of the compound:

F-DORM (SEMI_PROGRAM)  TP  282

R:  (w) 115        + (b) 164      + (u) 3  =  282
    (41%)            (58%)          (1%)

40.    Of the total 899 beds designated as program beds in general population, 566 or 63% ARE OCCUPIED BY WHITE males, while 317 or 35% are occupied by Black males, while 16, or 2 % are occupied by U/other. The 566 total white males on a program bed in general population represents 58% of the total white population, and the 317 Black males represent 24% of the total Black population, and the 16 U/other represents 44% of that population.

41.   When the program beds from RHU are added to the general population total, white males occupy 669 or 65% of the total 1036 total program beds at Limestone. This total of 669 (566 gen pop.)(103 RHU), means that 70% of all white males at Limestone are assigned to a program bed. Only 352 Black males out of a total of 1350, or appx. 26% are assigned to a program bed at Limestone. Conversely, eighty-two (82%) of all non-program beds in the RHU and nearly 78% in general population are assigned to Black males.

F. GANGLAND / GANG CONTROLLED DORMS ON B-SIDE YARD

42.   After segregating A, B and C yards by race, Defendant Hamm, Streeter, McKenzie, Caldwell, Wallis, Pelzer, Johnson, Bill, Williams and Crabtree structured each dorm to be controlled by one of the three Black gangs, i.e., Crips, Bloods or GD (Gangster Disciple or Growth and Development). Under the control of the gangs, who work hand-in-hand with the Defendants, Alabama prisons have witnessed unprecedented explosions in violence, a

national leading death rate, record-setting deaths in the ADOC over the
past five years, and levels of violence never before seen in the state's
prison system.

43. Defendant Hamm is well-ware and fully informed of the gang structured
and controlled dorms throughout his prison system. **Hale v. Tallapoosa
Cnty.**, 50 F. 3d 1579 (11th Cir. 1995)(Whether a prison official had the
requisite knowledge of a substantial risk is a question of fact subject
to demonstration in the usual ways, including inference from circumstantial
evidence.). Defendant Hamm is fully aware of the dangers inside the ADOC
from the numerous lawsuits he has faced alleging that the prison are controlled
by gangs with the consent of all ADOC supervisors.

44. In **Faulkner v. Dunn et. al.,** 2019 US Dist. LEXIS 194837, the United
States Magistrate Judge described Holman as follows: "Defendants [ADOC
officials including Defendant Hamm] present facts demonstrating that Holman's
B-Dorm was a hostile, threatenting, and unsafe environment. **The record
evidences that it housed gangs, gang leaders, and was known to be a violent
environment.**" Scofiled v. butler, et. al., 2024 US Dist. LEXIS 55300,
contains allegations that Ventress prison **"is being run by gangs, who
beat, rape, and murder other inmates.. . Additionally, gang members will
wait until an inmate has finished making a purchase in the sandwich line
and then swarm the individual with knives, and rob them."**

45. The Estate of Tracy Howard Besselaar, a 56-year-old Caucasian male,
described his transfer to J-dorm at Fountain Correctional Facility and
his placement into J dorm as follows:

J-Dorm is one of four of Fountain's primary housing units located in the main building of the prison. G, H, I and J Dorms are open warehouse-styled buildings, each housing approximately 150 inmates. . . To create privacy and hide from security cameras, inmates at Fountain draped sheetes along the feet of the bunk beds, creating humps within the prison. Crimes such as assaults, rapes, stabbings, murders, and drug sales occurred within the privacy of the humps. . . .

Upon entering J-Dorm on June 1, 2021, Besselaar, carrying his mat, bedroll, and personal property, proceeded to Bed 73A. Another inmate was on the bunk and, after Besselaar told him the bed had been assigned to him, the inmate became belligerent and told Besselaar that "white boys" had to bo to the TV room until "Bloods" decided where to put him. . . As Bessellar was speaking [to an ADOC officer about his bed assignment], several inmates, two carrying lock-blade knives from outside of prison tucked conspiciously in the waistbands of their uniform pants, approached and crowded Besselaar and the CO. The CO told Besselaar to find somewhere else to sleep. When he returned to the TV room, other inmates told Besselaar that J-Dorm was the "Blood" dorm and, that unless Besselaar wanted to get killed, he should shut up and do as he was told."

"J Dorm consisted of around 20 white males, 6 Hispanic inmates and the remaining inmates were Black."

46.  The plaintiff was located at Fountain prison in 2020, and his experiences and observations were identical to those of Besselaar, except that the

have gang problems; he has stated on public television that the prisons
have gang problems, and he has always associated the violence, drugs, living
conditions, etc., to the gangs. The fact that all of the litigation he
has been confronted with in the past 8 years all cites the gang issues,
including the DOJ litigation, the wrongful deaths, and the stabbings, drug
overdoses, etc., all prove that he has knowledge of the gang dorms and
their concommitant issues.

51.  Defendant Hamm, while operating understaffed and overcrowded prisons,
See **Barefiled v. Dunn** et. al., 688 F. Supp. 3d 1026 ("the alleged understaffing
by titself plausibly creats as substantial risk of serious harm regardless
of any other [conditions]."), citing **Braggs. v. Dunn**, supra, has decided
to outsource security operatiogs to gang members, who are granted impugnity
to use violence, extortion, rapes, and other forms of abuse to maintain
control of their domains.

52. Defendant Hamm has empowered Defendant Pelzer to serve as the Security
Threat Group; Gang Officer at Limestone. In this capacity, Defendant  Pelzer
overtly and explicitly confronts new arrivals to Limestone with questions
about gang affillations if they are Black. See **Williams v. Pelzer**, supra.
Defendants Chaplain James Williams and Asst. Chaplain Seigfried Bill conduct
interviews for the Faith Based Honor Dorm, and they specifically question
Black applicants as to whether they are gang-affiliated **or**  have  any gang
tatbooes. These Defendants then conspire or agree by custom and practice,
in concert with Defendants Streeter, McKenzie, Wallis, CAldwell and others
to keep Black males from entering the FBHD, which is over 80% white.

53.  Collectively, these Defendants, all with the knowledge, authorization and consent of Defendant Hamm, all ensure that Black males at Limestone are subjected to assignment on B-Side yard, dorms I, J, K and L, where violence, drugs, abuse and denial of equal protection of the law is guaranteed.

54. Individuals such as the plaintiff, who are not in gangs, are subject to extreme violence on a daily basis. Our bed assignments, whether we receive a bed, what we watch on TV, how much exposure we are subject to second-hand smoke from cigarettes, drugs, and other chemicals, are all determined by gangs. Any incident a person is involved in has potentially deadly conse-quences. If you are not in a gang, every situation you are involved in, you will be outnumbered 50, 60-1 or worse. Murders in I dorm (September), K dorm (February 2025), L dorm (February), and several beatings sicne February have all involved 8-10 versus 1 individual.

55.  The Defendants have acted with deliberate indifference and personally participated in the unconstitutional conditions of confinement on B-side yard at Limestone CF through a custom and practice of racially segregating Black residents to this side of the yard where, excessive force, inmate-on-inmate violence, punitive use of chemical spray, history of abuse by subordinates, and otherwise "obvious, flagrant and rampant" abuse takes place on a daily basis.

## G.  RELIGIOUS SEGREGATION

56.  The religious communities are also segregated by race and subjected to unequal treatment, in violation of the First and Fourteenth Amendments.

57. Every dominant Black/Afrocentric religious/spiritual community is segregate

to B-side yard at Limestone, which includes the Nation of Islam, the Nation of Gods and Earth, Metu Neter, Sunni Islam, and the Moorish Science Temple of America. The membership of these faiths, which are majority or exclusively composed of Black men, are all confined to the racially segregated B-side yard. This means that 90% to 100% of all members of the Black/Afrocentric faiths are subject to racial and religious discrimination by Defendants Hamm, Streeter, McKenzie, Caldwell, Wallis, Pelzer, Johnson, Williams, Bill and Crabtree.

58. To the contrary, A-side yard and C-side yard, which consist of a majority white male population, is filled with all white religious communities. White Christians, Odinists, Wiccans, Asatru and other Eurocentric faiths are housed on this/these yards to the Faith Based Honor Dorm or B-Dorm (not B-side yard). In addition to this, all white gangs are stationed on this side of the prison, including Aryan Nation, Southern Brotherhood, Neo-Nazis, skiin-heads, and the KKK. These groups enjoy unlimited access to every amenity, privilege and resource offered at Limestone.

59. After racially segregating the prison population, the Defendants then afford, observe and respect both privileges and rights of the white population unequally, in violation of the Equal Protection Clause of the 14th Amendment, including as follows:

(i) <u>B-side Yard, Dorms I, J, K and L</u> (The Black yard)
B-side yard, dorms I, J, K and L, are locked down 24 hours per day, 6 days per week. Otherwise, each dorm receives one "yard call" per week which usually lasts appx. two (2) hours, from 8:30-10-30 am. During this two hour "yard call" -- I-dorm on Mon, J-dorm on Tue, K-dorm on Wed., and L-dorm on Thur. -- residents are expected to 1) draw canteen, 2) attend medical or mental health appointments, 3) attend religious services, 4) to the law library, or 5) go to the rec yard.

-24-

60. after being forced to choose between these activities during the two hour "yard call" each week, B-side residents are expected to remain in their respective dorms the remaining 6 days each week, on lockdown 24 hours each day. This overcrowded space is shared with upwards of 240 individuals with no security, deplorable living conditions, no in-house programs, and with no escape from an environment ran by gangs, drugs and violence.

61. In this setting, stabbings, fights, beatings, rapes and sexual assaults, robberies, murders, drug overdoses, extortion, mental health crises, and threats occur on a daily basis, without retreat.

(ii)  <u>A-side Yard and C-side Yars, Dorms B, F and H  (The White Yard)</u>

62. In contrast to B-side; yard, A-side yard and C-side yard, which are predominantly white populated, are ran totally opposite:

First and foremost, all three of these dorms are program dorms. This means that all three dorms are ran with a security structure designed to weed out problems and remove them from this environment. Those removed are sent to B-side yard, where they are permitted to engage in whatever mischief they desire.

These dorms have a recreaction yard that is open nearly 18 hours each day from 7:00-2:00 am. Thus, majority white males in these dorms receive more yard time in <u>one day than</u> B-side yard residence receive in two months. Additionally, even when these respective rec yards are closed, these residents receive smoke passes to go outside at any time of the night. No dorm on B-side yard is permitted a smoke pass, meaning that all of the B-side dorm residents (including those who do not smoke)

-25-

are exposed to second-hand smoke from cigarettes, Fentanyl,
meth, Flaka and "wicks" without ceassation, and without consequence.
Use of drugs are strictly prohibited on A-Side and C-Side
Yard, and even a rumor of drug use or dealing will result
in automatic expulsion.

In addition to unlimited rec time and the health benefits
of not being subject to second hand smoke, A-Side and C-Side
residents have unlimited access to the Chapel, Earth Based
yard, law library, cleaning supplies, and strict enforcement
of basic hygeine rules. Taking a bath is mandatory, whereas
on B-Side yard, many individuals exist without a change of
clothes, no place to sleep, no hygeine supplies, and no obligation
to bath or clean themselves or their clothing.

H-Dorm residents have access to unlimited educational,
rehabilitaion and recreation resources, including a weight
pile, classes, soap, hygeine products, andpriority to all
freeworld classes, trade school and ABE GED classes. B-Dorm
residents, though they don't have in-house classes, do have
in-house libraries just like H-Dorm, they have five t.v.'s,
in-house monitors and cleanup crews,and immediate access
to security.

With these resources and accomodations, these dorms rarely
experience any forms of violence, abuse or exploitation.
Any hint of such issues draws the immediate attention of
the administration, whereas such issues, as detailed in
Barefiled v. dunn et. al., 688 F. Supp. 3d 1026 (M.D. Ala.
2023), the DOJ Reports, and other litigation, routinely go
ignored and without any official response on B-side yard.

Defendants Hamm, Streeter, MaTeazie, Caldwell, Wallis, Pelzer, Johnson, Bill and Williams are fully aware tht their actions of racially segregating individuals violate clearly established federal law, and creats substantial risks of violence. See Pugh v. Locke ex rel james v. Wallace, 406 F. Supp. 318 (1976)(M.D. Ala. 1974):

> "Inmates are denied meaningful opportunities to participate
> in  vocational, educational or work activities. As a result,
> most inmates spend substantially all of their time crowded
> in dormitories in absolute idleness. Such unbroken inactivity
> increases boredom, tension and frustration, which in turn promotes
> incidents of violence. The evidence reflects that idleness
> of this magnitude destroys any job skill and work habits inmates
> may have, and contributes to their mental and physical  degen-
> eration."

Recently, in Johnson v. California, 543 US 499, the United States Supreme Court re-affirmed its prior holding that, "prison officials, by perpetuating the notion that race matters most, racial segregation of inmates may exacerbate the very patterns of [violence that it is] said  to counteract."

63.  The Defendants are clearly aware of policies and practices that they can use to resolve or fix the many issues in existance on B-side yard by virtue of the fact that the privileges and respect for rights that they observe on A-side yard and C-side yard, such as zero-tolerance for drug use and sales, libraries, programs and structured living dorms, full access to the recreation yard, religious services, and outside fresh area, responsive security staff, and other privileges and inducements specific to the population. Gang-interdiction programs, job skills and

training, conflict resolution, and mediation training, mental health consults
for the extreme trauma individuals have been subjected to, and incentivize
positive behavior.

## H. USE-OF-FORCE / EXCESSIVE FORCE INCIDENTS

64.  Limestone CC is plagued by use-of-force incidents and excessive force
incidents. The overwhelming majority of these excessive force applications
are deployed on the racially segregated B-side yard and are enforced upon
Black males. Since arriving at Limestone on May 30, 2024, the plaintiff
has observed several of these incidents, been informed of many more incidents,
and been a victim of excessive force in August 2024. The haphazard and
excessive uses of excessive force, without just cause, is a pattern,
practice and custom of abuses by Limestone officers, which is well-
documented by the 2019 and 2020 DOJ reports and civil filings before
this court. See **Williams v. Pelzer**, et. al., 2024 U.S. Dist. LEXIS
27300, supra.

65. A hallmark feature of these use-of-force incidents is that the
supervisors routinely cover up these incidents by not requiring incident
reports to be written, no body charts are done, and the individual
is coerced into walking away from the incident or face disciplinary
actions and an extended period in restrictive housing for assault  on
an ADOC and other cahrges. There are at least 10-15 of these incidents
each month, almost all of which are undocumented and unreported.

66.  In addition to this, the medical staff routinely underreports
injuries and often times refuses appropriate medical care due to conflicts
of interest that includes having personal relationships with officers.

67. Darnell Demarcus DeDrea Harshaw is a prime example of the flagrant abuses of authority and complicity amongst the staff and medical personnel. On the night/early morning of July 24, 2024, Mr. Harshaw was apprended outside I dorm attempting to retrieve contraband. The first officer on the scene, Ofc. Clemons, immediately placed Mr. Harshaw into handcuffs. after being handcuffed and rolled onto his stomach, a second officer, Officer Charley -- the same Oficer Charley listed as a defendant in the **Williams v. Pelzer** case --  arrived to the scene an immediately kicked Mr. Harshaw in the face despited the fact he was handcuffed, on his stomach, and not resisting in any way.

68.  Mr. Harshaw was then thrown behind I dorm where Officer Charley began to stomp him in the lower back and upper back areas. At the same time that Officer Charley was beating and stomping Mr. Harsh  , a third officer, Officer Jacobs pulled a metal baton and struck Mr. harshaw multiple times in the head. Both blows from the baton busted Mr. Harshaws head open, one wound requiring 6 stitches and the other requiring 4 staples.

69. Despite receiving significant trauma from being beaten, the medical staff refused to send Mr. Harshaw to a freeworld hospital. Mr. Harshaw described his injuries as follow in a civil 1983 lawsuit:

> "nerve damage, it made me drop-footed, damage my akiles
> [achilles] and my left hip."

> .    .    .    .    .

> "Not only do i have to have surgery on my akiles, I might
> have to have surgery on my hip. 6 stitches, 4 staples,

I'm drop-footed now after this situation. they lie on my
disciplinary said I attempt to escape force of use (sic)
and my punitive damage. I have crooks in my neck all night
sometimes. i have whiplashes. I got nervous, jumpy, and
sweaty when I see the officers, any loud noise after the
incident make me jumpy and I have nightmares every other
night about getting hit in my head and stomped on my back.
I'm requesting $100 million dollars or a medical leave
probation. Im 27 years and Im young. I can't defend or
protect myself. Ain't no camp I can go to where Im able
to help, take care, or protect myself. I can't shower without
help. aad headaches, mental anguish.

70. Mr. Harshaw is appx. 5 ft, 6" inch. tall and weighs less than 150
lbs, while Officer Charley is appx. 6 ft and weights over 225 lbs and
Officer Jacobs is at least 6'2 and weights appx. 250 lbs. Mr. Harshaw
currently resides in L-dorm, which is by far the    worst and most violent
dorm at Limestone as of April 2025. He is wheelchair bound, completely
disfigured from the hips down, and his legs are barely able to sustain
him. He has never had any corrective surgies or an MRI to assess the
extent of his nerve damage or neurological injuries from the blows to
the head by Office Jacobs while being defenseless, handcuffed to the
rear, and outnumbered three-to-one by officers who more than tripled
his body wight.

71.  Since beating Mr. Harshaw, Officer Jacobs has been promoted to the
postition of supervisor, as Defendants Hamm and Streeter are prone to
do when it comes to officers who are accused of misconduct and abuses
of authority and excessive force aginst the men inaarcerated at Limestone.

LIST OF INCIDENTS ON B-SIDE YARD
ESTABLISHING EXCESSIVE RISK OF SERIOUS INJURY
DUE TO RAMPANT, FLAGRANT, AND OBVIOUS INMATE VIOLENCEO

Note* The following is not a comprehensive list of all violent incidents on B-side yard over the past 9 months

72. April 29, 2025:  Fighting incident on I-dorm. Code called and over 20 officers respond.

73. Institutional Grievance Officer called six individuals from Restrictive Housing Unit affer being informed that their grievances were not being turned in by seg. officers. 4-24-25

74.  4-23-25:  stabbing incident in L-dorm reported overnight

75.  4-18-25: Use of force incident in I-dorm; Fight in dining hall at Lunch/L-dorm resident and use of force incident in dining hall resulting is serious injury and busted eye of I-dorm resident; stabbing incident

76.  4-16-25:  Use of force incident in I-dorm by front tv room. Grievance filed; Fight in I-dorm appx. oneh hour before use of force incident.

77. 4-15-25:  Stabbing in J-dorm

78.  4-8-25:  Major code called to L-dorm; multiple fighting incidents;
    Officers forcing haircuts on B-side yard, denying entry to dining hall to anyone who refuses a haircut

79. Officer Carmichael on crossover gate. Pulled mace from belt on three separate occasions in less than 30 minute span. Captain Pelzer stood

by and watched as incident unfolded.

80. 4-6-25:  Stabbing in L-dorm; Officers in I-dorm going cell-to-cell conducting search for individuals involved in second fight of the morning.

81. 4-4-25:  Stabbing in G dorm this morning. A hit was sent to be carried out from L dorm. the supposed "hitman" was allowed to cross the yard, enter three separate gates to gain entry to G-dorm, pulled up to info the intended victim that he was there to carry out a hit, and the intended victim defended himself by, among other things, stabbing the hitman.

82.  4-3-25:  Terrance Bobby Sims sprayed with mace then taken to unknown location where he was then forcibly submitted to a haircut. Officers involved includ Sgt. Parker (incident report # LCF-25-00483-1

83. 4-3-25: Fight in G-dorm;  Kelvin Peacock, an elderly man, sprayed and assaulted by Officer J. Franks. Thursday. 6:50 pm.

84. 4-1-25: Appx. 6:30-7:00 am Fight on A-side, I dorm.

85. 3-29-25:  Received information concerning the death while in police custody of DeMarcus McCloud. Officers involved include Sgt. Steven Parker and Demetrius Charley;  Learned today that staff rounded up appx. 4 sexual predators on Monday/Tuesday March 17-18, 2025.

86. 3-28-25:  Fire set in L-dorm; Another assault in G-dorm; Drug overdose in L-dorm at appx. 10:15 am. Rolled out on metal cart without medical assistance

87. 3-27-25:  stabbing at entry to dining hall

88. 3-26-25:  Multiple stabbings overnight in L dorm

89.  3-24-25:  stabbing in G-dorm overnight

90.  3-22-25:  Throat-slashing incident in K-dorm

91. 3-20-25:  Travis "Lucy" storey stabbed and beaten in J-dorm; Several
individuasls removed from dorm on alleges investigation

92. 3-18-25:  Drug overdose I dorm, %x 5:00 pm; Drug overdose 9:00 pm
                Two Allied Serurity officers allegedly arrested

93. 3-6-25:  Former ADOC officer charged in federal bribery, conspiracy
charges;  jStaff locked up at least three individuals from I dorm (C. Lee,
G. Johnson and W. G.) for investigation into contraband.

94. 3-11-25:  CERT unit dispatched to search J and L dorm for contraband

95.3.-5-25: Mexican stabbed and kidnapped in L dorm overnight;  Learned
that drugs were found in staff bathroom in shift office.

96. 2x2x25:3-3-25:  Overnight drug carze where multiple individuals sprawled
out all over dorm

97. 2-28-25: Drug overdose death on Fentanyl, Christopher Gunn.

2-21-25:  Multiple incidents of violence and events have occured over past
two weeks. Overnight Thur. a few incidents occured, including a sexual
assault in I-dorm; Stabbing in I dorm; Officers in dorm, lead by Officer
Booker who brought in an individual who was hit in head with a pipe overnight
in L-dorm

99. 1-30-25: Severely mentally ill patient, Puryear brought into dorm after
being frocibly removed from shift office on orders of Lt. Johnson. Puryear
was seeking protection after being beaten in J-dorm and L-dorm

100. 1-25-25: Use of force incident in mlobby of I-dorm

101. 1-24-25:  L-dorm beating and stomping, lead to death; I-dorm assault/eye
busted, poss. stabbing

102. L-dorm resident removed from dorm and assaulted on sidewalk/beaakfast/
dining hall fight

103. Death/assault in K-dorm Michael James Thomas. 1-22-25; Suicide death
overnoight in E-dorm

104. Ofc. Carmichaél incident on B-side

105. 1-4-25: kEarly am attack resulting in possible stabbing/stick attack
              Freeworld hospital transport after violent incident

106. 12-30-24: Timothy Jackson sexually assaulted in gym bathroom by Ofc.
Richards/Franks over alleged theft of property from shift office in gym

07. 12-25-24:  stabbing in K-dorm

108. CERT unit searches I, J, K and L dorms only. skipped K-dor, which then had aa stabbing two days later in K-dorm. 12-23-24

109. 12-21-24:  stabbing on yard from L-dorm; a severe axe attack in J-dorm. Subsequently met the victim, who was less tahn 5'5, 140 lbs. Victim was re-assigned to J-dorm after being released from hospital. Arm nearly severed in attack, and permanant loss of use and nerve damage across neck, sholulder arm area.

110.  Fight in I-dorm at appx. 5:40 pm. Overnight stabbing in G-dorm. Guys heard outside hollering for officer to come to dorm as no officer was assigned to dorm. Victim still in dorm with attacker. 12-19-24

111. 12-11-24: Stand-off with officers in front of J-dorm due to lack of canteen and exercise time; Stabbing in I-dorm, b-side; Officer allegedly slapped this morning

112. 12-14-24:  Bad stabbing after robbery in L-dorm;  Ofc. Elkins allegedly hit guy in face with baton multiple times, then got stabbed or weapon drawn on him

113.  12-11-24:  Stabbing in K-dorm during yard call

114. 11-26-24:  Multiople fights in I-dorm over weekend

115. 11-20-24:  OD on B-side, I dorm. Narcan administered to revive indivi- dual.

115. 11-17-24:  Drug overdose death in K-dorm; Murder reported in C-dorm in Restrictive Housing Unit, involving Christian Whittle # 268877.

116. 11-14-24: Multiple individuals caught outside dorm and one cut bad by fence near breakfast time; During lunch officers assault two or three people in lobby (J.B., Mike from Hsv, and a third person).

117. 10-31-24: Officers come around and detain/arrest 7 or 8 people for beathing death/murder that occured in I-dorm two days prior. (Reggie)

118. 10-29-24: 3:00 am Bad stabbing/beating in I-dorm. No officers in sight, fight took plave over course of several minutes and different locations. Victim ultimately died. 2:00 Code to J-dorm; 5:00 pm fight and stabing in I-dorm, B-side. 5:00 pm Code dining hall incident

119. 10-28-24:  Incident in restrictive housing unit; possible Whittle incident. Murder

120. 10-27-24: In lobby trying to receive mail when two fights break out. Six or seven versus one person, with multiple blows to head from stick and punches;  9:00 am - multiple individuals slapped at table. No security in sight;  9:15 am Diego assaulted in dining hall by Ofc. Jones, with no incident report or body chart (Underwood "Pep" also assaulted. Mace sprayed in lobby by Ofc. Carmichael;  Another fight in I-dorm around 9:00 am.

121.  10-19-24:  stabbing at breakfast (Day-Day)

122.  10-17-24:  Week filled with stabbings in L-dorm and another incident on Monday.

123.   Other incidents of note include:   10-10-24:   Black male, mentally ill sexual predator attempting to force himself into my assigned cell to retrieve his former cellmamte, Mr. Grady Wilkes, a white male who moved out of the cell after discovering he was deranged. The individual convinced the cubicle operator to open my cell while he was brandishing a axe; 10-8-24:   racially motivated incident in H-dorm where appx. 20 white supremacist surrounded one Black male. Staff removed appx. 8 Black males from H-dorm, no whites over incident, including Mario Primm, Tyler Hill, among others; 10-3-24: Knives drawn on Ofc. Elkins, again;   Officer punched;   Officer Jones used excessive force on another individual; 9-21-24:   Timothy . Jackson assaulted by Ofc. Collins, head ran into wall and leg bleeding. Jackson stated taht Captain Pelzer offered him two packs of Tops cigarettes to not file a complaint;   10-21-24:   Officers confiscate 10 grams of Fentanyl and turn it over ot Captain Pelzer. The individual was allowed to remain in general population after agreeing to turn in multiple missing government issued items (baton, handcuffs and handcuff ket). These items had been missing for months with no report; 9-21-24:   Drug overdose; 9-15-24:   Ofc. Elkins using force in dininghall on Black male, Ofc. Elkins using force on white male in front of J-dorm.

124. & 9-4-24: Reports of murder in Restrictive Housing Unit in past 48 hours. Date and location uncertain

125. As the above list of incidents show, nearly all of them took place on the racially segregated B-side yard or the racially segregated restrictive housing unit. These incidents show that the Defendants are subjecting Black males in their custody to heightened levels of violence and threats to their safety by confining them to areas where there is a lack of access to security officers, classrooms, recreation, opportunities to enroll

in trade school, attend religious services, etc., which are all made
available to the areas of the prison where white males are assigned on
a daily basis. as a result, the Defendants know that they can reduce
violence, drug addiction and criminal behavior by investing in resources
as they have done in areas where white inmates are assigned, but they
have failed to do so. See **Barefiled v. Dunn**, 688 F. Supp. 3d 1026 (N.D.
Ala. 2023). **Goebert v. Lee Cnty**, 510 F. 3d 1312 (11th Cir. 2007).

126.  The Defendants are also aware that Black males assigned to B-side
yard are exposed to heightened levels of excessive force and exposure
to being sprayed with amce and other chemicals by staff at Limestone.
**Williams v. Pelzer, supra.** The Defendants know this because, as alleged
above, most, and nearly all, of the use of force and chemical spray incidents
occur on B-side yard, or in the Restrictive Housing Units were Blacks
are racially segregated.

127.  The Defendants are also aware that the practice of racial segregation
in Alabama's prisons is unconstitutional. See **Lee v. Washington**, 390
US 333 (1968)(**racial segregation ruled unconstitutional in Ala, where
prison authorities argued that desegregation would undermine prison security
and discipline**). The Defendants are further aware that their custom and
practice of racial segregation "may exacerbate the very patterns of [violence
that it is] said to counteract." **Shawn v. Reno**, 509 US 630 (1993); **Johnson
v. California**, 543 US 499 (2005).

128. Furthermore, by confining Black males to areas of the prison where
they are on 24/7 lock down while in general population, the Defendants
are creating customs and practices that ensure violence, as well as physical
and mental deterioration. See **Pugh v. Locke, ex rel James v. Wallace**,

406 F. Supp. 318 (M.D. Ala. 1974):

> "Inmates are denied meaningful opportunity to particiapate
> in  vocational, educational or work activities. As a result,
> most inmates must spend substantially all of their time
> crowded in dormitories in absolute; idleness. Such unbroken
> activity increases boredom, tension, and frustration, <u>which
> in turn promote incidents of violence</u>. (emphasis added)
> The evidence reflects that idleness of this magnitude destroys
> any job skills and work habits inmates may have, and contributes
> to their mental and physical degeneration."

129.  The Plaintiff has been denied enrollment in trade school, program
dorms, job placement in the law library or other area where he has skills,
enrollment in classes, and has been repeatedly refused opportunity to
be placed in B-dorm, F-dorm and H-dorm. In addition, the Defendants routinely
 deny Black males access to H-dorm and B-dorm, which are the two main
program dorms at Limestone in general population, and Black males are
denied access to C-dorm, A-side and E-dorm, B-side in the restrictive
housing unit, whcih are both disproportinantly assigned to white males.
These decisions by the Defendants subject Black males at Limestone to
constant threats of violence, mental and physical deterioration, erosion
of job skils, fail to provide rehabilitaion opportunities, maintains
"conditions which makes rehabilitaion impossible" (Id), and creats environments
defined by "idleness and deplorable living conditions" that "contribute
further to the ever present threat of violence from which inmates have
no refuge." (Id.)

130. On B-side yard in dorms I, J, K and L, drug overdoses are so common that officers no longer even call for medical assistance. Mentally ill individuals exacerbate  their mental health issues with easy access to drugs such as Flaka, Fentanyl, meth, and others. These individuals are forced out of their assigned cells and forced to sleep on the floor, in television rooms, and even mop closets. Many of them and other addicts don't  take baths for weeks and months at a time, often smelling like death on wheels.

131. Sexual assaults, as described by the US DOJ in their reports, are rampant because the victims are easily conjoled into drug debts. With no in-house classes available for drug treatment, and no security to oversee the drug operations and gang violence, the Defendants are creating conditions of confinement that amount to and easily surpass cruel and unusual punishment at Limestone CC.

132. To add insult to injury - and more injury -- the Defendants permit smoke passes in B-dorm and U-dorm 24 hours per day with designated smoking space for residents to smoke without harming non-smoking residents. On B-side yard, however, although the Defendants continue to sell cigarettes on the canteen and witness drug overdoes on a dialy basis, they refuse to authorize smoke passess. Residents in these dorms are subject to second hand smoke from cigarettes and drugs such as fentanyl, crack, meth/ice and Flaka 24/7 in all areas of the dorms from the living spaces, television rooms, shower areas and every inch of space in between, without entreat.

133. Finally, the Defendants have resorted to issuing out soap rations every other week. This means that grown men are provided with one bar of soap, every two  weeks. according to Correctional supervisor Tenberge,

soap ration is limited to B-side yard, only, allegedly due to COVID funds being expended. However, these restrictions are not being imposed on A-side yard and C-side yard to predominantly white residents.

## COUNT II. DEFENDANT HAMM AND OTHER DEFENDANTS CREATE CREATE DANGEROUS CONDITIONS ON B-SIDE YARD WITH DRUGS

134. Defendant Hamm has a major drug problem in the Alabama prison system. Alabama citizens confined to the ADOC are being exposed to, and have easy and unlimited access to Fentanyl, Ice/Meth, Flaka, Heroine, Cocaine, pills, and basically every other drug of their choosing.

135. The introduction and heavy trafficking of these drugs into the ADOC has created an environment where drug overdoses, drug-related deaths, and drug related crimes like extortion and robbery run rampant throughout ADOC, including at Limestone.

136. FAmily members, news media reports, the DOJ reports, legislative hearing and admissions made by Defendant Hamm all confirm the crisis of drugs and the harm they are causing in ADOC. Despite these facts, Defendant Hamm has taken little to no action in attempting to stop the flow of drugs into the prisons, or at Limestone.

137. Defendant Hamm is acutely aware of the dangerous environment that drugs have created at Limestone. He is also aware of the corruption by his staff at Limestone due to the numerous arrests. Despite this knowledge, Defendant has taken no action to stem the flow of drugs, provide training and support to his officers, or even implement random drug tests of his officers.

138. Defendants Streeter, Crabtree, McKenzie, Caldwell, Wallis and Pelzer, as members of the Limestone Security staff, were aware of the drug trafficking at Limestone, but failed to take actions to stop them from entering the facility. Instead, these defendants became complicit with the drug trafficking by allowings and incarcerated individuals alike to operate their drug enterprises with immunity.

139. Defendants Crabtree, James and Sophia Chambers, Becca Marsh, Tia Scott, Monika Blakeney, and Universal Protection Services, directly participated in the drug trafficking enterprise and actively conspired with other named and unnamed ADOC officers and officials to exploit and take advandage of the lucrative drug trade opportunities due to the acts and ommisions of Defendants Hamm, Crabtree, Streeter, McKenzie, Wallis, Pelzer and Caldwell, whcih allowed the drugs to flow freely throughout Limestone.

140. On December 7, 2022, four Limestone correctional officers, Alex Andreas, Andrea Roy, John Ketterman and Shammarion Dozier, were all arrested and cahrged with various drug related distribution and corruption charges for activities they conducted at Limestone. These Defendantsand unnamed co-conspirators operated with the knowledge, authorization and consent of Defendants Pelzer, Wallis, McKenzie, Crabtree and Streeter.

141. Subsequent to their arrest, the head warden at Limestone, Defendant Chadwick Crabtree and his wife, were arrested and charged with various drug manufacturing and distribution charges tied directly to Limestone prison. Defendant Crabtree operated his drug distribution enterprise in concert with Defendant Pelzer, and with the knowledge, authorization and consent of Defendants Streeter, McKenzie, Wallis, and James Chambers.

-42-

142.   Defendants James and Sophia Chambers, Becca Marsh, Tia Scott, Monika
Blakeney, and Universal Protection Services, among others, also participated
in the drug trafficking operation at Limestone until their arrests as well.
See Paragraphs 17 through 20, above. These Defendants, with knowledge and
intent, contributed to the overall dangerous and deadly conditions at Limestone,
especially on B-side yard, where all of their drugs were destined.

143. By trafficking such drugs as Fentanyl, heroine, ice/meth, and Flaka,
these Defendants caused the ruin of lives both inside and outside Limestone
walls. Countless family member have issued statements, filed litigation,
and given testimony before legislative committes and law enforcement officials
about the financial ruin, overdose deaths, extortion and financial ruin
they ahve suffered as a result of these Defendants and others who have
contributed directly to the drug operation at Limestone.

144. Defendants Hamm, Streeter, McKenzie, Caldwell, Wallis, Johnson, Pelzer,
and others, intentionally turned a blind eye to this crisis, or otherwise
participated in it, and failed to take any action to protect the lives
or financial assests being lost, ruined or destroyed.

145. A common denominator among all of these drug trafficking Defendants
is the fact that they all were directly associated with, or otherwise traffick-
ing to someone on B-side yard. all of the Defendants conspired to racially
segregated B-side yard, thereby creating a lucrative drug market and morass
of moral decay whereby predominantly Black males were isolated, deprived
of all educational, rehabilitative, and recreationaly access, locked down
nearly 24/7, deprived of security and prevented from enrollment in trade
school or vocational classes, and then provided with an unlimited amount

illegal, harmful and deadly drugs, which created a culture of criminality and violence, exacerbated by mental health issues, resulting in murders, stabbings, extortions, thefts, beatings, robberies, sexual assaults, excessive force, racial profiling and racial policing tactics, and other delitorous concerns that occur on a daily basis.

146. Substantial evidence exists to support the conclusion that Black males are being singled out and racially segregated to B-side yard were they are then exposed to inhumane and unconstitutional conditions that create substantial risk of injury to health and person on a daily basis.

147. A example of this includes the following: on April 9, 2025, the administration at Limestone began the process of converting G-dorm into a program dorm on C-side yard. One of th first acts of the administration was to remove a large group of Black males from the dorm and replace them with a large group of white males who were assigned to B-side yard. All of the Black males were moved to B-side yard. **See Plaintiff's Exhibit ____,** Bed Movement 4/9/2025 G_DORM.

148. This exhibit shows that the following Black males were removed from G-dorm:    Frank Raven(B)286709,    Derrick D. White(B)206608, Ashton D. Taylor(B)334498, Michael J. Harris(B)189761, Laquinton D. Smith(B)282409, Reginald Howard(B)240672, Elijah Russell(B)239137, Deramus R. Austin(B) 275417, Isaiah D. Atkins(B)265125, Jiraud Bumpers(B)304120, Tezyre J. Moore(B)332622.

149. This same exhibit further shows that all eleven of these Black males were replaced by nine (9) whites, one Latino, and one Black male: Tyler D. Hill (B) 330178, Noe Mateo (u) 324823, Myles F. Montgomery (w) 265412,

Phillip J. Webster (W) 226126, Shannon E. Payne (W) 298359, James M. Hargrove
(W) 177795, Robert R. Gowan (W) 267715, Blake A. Fiaccato (W) 238675,
Neal T. Green (W) 238904, Shawn M. Hartman (W) 216750, Jonathan L. Vinson
(W) 282727.

150. By removing white males en masse from B-side yard, dorms I, J, K
and L, and replacing them with Black males en masse, as **Exhibit** ____,
shows was done on April 9, 2025, furthers the Limestone administration's
policy of racially segregating its prison population in a manner that
denied equal protection to Black males in violation of the Fourteenth
Amendment, and subjects them to conditions of confinement of a prison
yard, B-side yard, that is rift with violence, dehumanization and constitution-
ally deficient living standards.

RELIEF SOUGHT

A. Injunctive Relief

151. The Plaintiff seeks an order from the Court enjoining the Defendants
to immediately desegregate Limestone Correctional Facility.

B. Damages

152. The Plaintiff seeks damages from the Defendants, individually and
collectively, in the amount of at least $200,000.00, and any other relief
the Court deems just and proper.



# B Unit
# "A Better Living Environment"

This unit is the foundation and key to provide incarcerated individuals a better way of living based on opportunity and responsibility for those <u>willing</u> to make a change in their lives. This unit will help provide a better living environment through a structure based on positive principles and concepts of life.

This structured environment is for individuals who have decided to change their lives and have a desire to live in an environment that is conducive to that change. It is a dorm where no matter your race, religion, or gender identification, you will be able to function in a positive way. Residents are separated from the negativity of all other general population dorms in an effort to reduce the negative influence they may encounter there, and help support the positive changes they are attempting to make in their lives. *To help accomplish this will require the assistance ADOC. Crossover, Yard, Shift Office, and Dorm Officers should have a knowledge of who are B-Dorm residents to help eliminate or reduce non-resident traffic.*

If you are <u>willing</u> to make a change in your life, this environment is aimed at providing you with a safe, secure, and healthy environment in which you can receive encouragement to face your personal problems and find support needed to solve them once and for all. All while you are working to redevelop yourself so you can return home as a productive member of society. In addition, this will help the Alabama Department of Correction reduce the recidivism rate.

Upon entering a structured environment, <u>all residents must understand</u> that everyone will be guided and held accountable for their actions by other inmates. <u>All residents must understand</u> that negative behavior cannot continue to go unaddressed because their influence could be detrimental to someone else trying to better themselves to return to their families.

The Standard Operating Procedures for rules violations have been designed to address violations as they occur. The Unit's Structure Members can deal with many issues without burdening the ADOC officers that work in the dorm or other ADOC supervisors, **except in cases involving safety or security matters, PREA issues, or other serious violations, in which case an ADOC officer must be notified.** The rules violation procedure is as follows:

1) The person who witnesses the rule violation report it to the on-duty crew chief.
2) The on-duty crew chief and representative will talk, in a private area, to both the person who witnessed the violation and the person being accused of the violation. The accused person is then counseled and will be written up for the violation. All infraction write ups must be documented with another member of structure.
3) Points are deducted according to the level of infraction from the person who committed the violation, and community/extra duty will be assigned showing that there are consequences for violating rules. This will help raise the violator's awareness and responsibility to a more acceptable level.
4) If <u>any</u> resident feels an infraction write up is unjustified, they may request a complaint form which must be completed and submitted to the representative on duty within 24 hours of the counseling.

Whenever possible, violations will be resolved within the Dorm Structure chain of command. In cases where there has been a serious rule violation, or a violation cannot be resolved within the Dorm Structure chain of command, the matter will be referred to ADOC. Structure Representatives will provide a written statement with all related facts to be placed in the residents file for documentation. The dorm coordinator will then forward all relevant documentation directly to the ADOC dorm supervisor or proper ADOC chain of command.

# Dorm Structure Chain of Command

A productive structure team, as well as full support of the structure team by ADOC, is imperative to the successful implementation of a structured dorm environment. **Dorm Structure Chain of Command will be followed in ALL situations.** The Chain of Command order, and responsibilities of each, is as follows:

## Dorm Coordinator

Primary Function: To oversee and ensure operation of the Community. To solve problems brought to them by the Senior Representatives as they arise. The Dorm Coordinator must have outstanding communication skills. The coordinator will serve as the dorm liaison to the ADOC dorm supervisor.

## Senior Representative

Primary Function: To oversee and ensure the orderly operation of the Structured Community. To solve problems brought by the Representatives as they arise.

## Community Representative

Primary Function: To oversee and ensure the orderly operation of the Structured Community. To solve problems as they arise.

## Crew Chief

Primary Function: To oversee the specific operations of the Structure Community on a daily basis. To make sure that the established rules are being followed throughout the day in all area of the community. To be on duty at all times to resolve situations as they may arise in the functioning of the dorm. To ensure that their individual department are operating according to the established rules that have been implemented, and work with the Community Representatives in the ongoing development of their individual departments.

## Crew Member

Primary Function: Crewmembers are the residents that operate the various jobs in the Structured Dorm Community. These rules apply to members of every crew.

# BED MOVEMENT 4/9/2025 G-DORM

| 286709 | RAVEN, FRANK | B | G1-118A | I28-1A |
|---|---|---|---|---|
| 206608 | WHITE, DERRICK DEWAYNE | B | G1-72A | I41-1B |
| 334498 | TAYLOR, ASHTON DAVEQUANE | B | G1-35A | J6-1B |
| 189761 | HARRIS, MICHAEL JAVAR | B | G1-175A | J9-1A |
| 282409 | SMITH, LAQUINTON DEON | B | G1-86A | J69-1A |
| 240672 | HOWARD, REGINALD | B | G1-20A | J75-1A |
| 239137 | RUSSELL, ELIJAH | B | G1-16A | J77-1B |
| 275417 | AUSTIN, DERAMUS RASHUN | B | G1-94A | J77-22B |
| 265125 | ATKINS, ISAIAH DEANGELO | B | G1-25A | L3-1A |
| 304120 | BUMPERS, JIRAUD | B | G1-70A | L77-1A |
| 332622 | MOORE, TEZYRE JUSTIN | B | G1-184A | L77-13B |
|  |  |  |  |  |
| 330178 | HILL, TYLER DEARRIUS | B | J6-1B | G1-16A |
| 324823 | MATEO, NOE | U | L77-1A | G1-20A |
| 265412 | MONTGOMERY, MYLES FOSTER | W | I41-1B | G1-25A |
| 226126 | WEBSTER, PHILLIP JASON | W | K48-1B | G1-35A |
| 298359 | PAYNE, SHANNON EDWARD | W | J75-1A | G1-70A |
| 177795 | HARGROVE, JAMES NEAL | W | I28-1A | G1-72A |
| 267715 | GOWAN, ROBERT RYAN | W | L77-13B | G1-86A |
| 238675 | FIACCATO, BLAKE ANTHONY | W | J77-22B | G1-94A |
| 238904 | GREEN, NEAL TATE | W | J77-1B | G1-18A |
| 216750 | HARTMAN, SHAWN M | W | J9-1A | G1-175A |
| 282726 | VINSON, JONATHAN LEE | W | L78-23B | G1-184A |